Fannie Lazarus, Appellee, v. Thomas J. Friel et al., Trustees, Trading as Chicago Surface Lines, Appellants.

Gen. No. 43,737.

554

Opinion filed June 4, 1947. Rehearing denied June 19, 1947. Released for publication June 19, 1947.

JAMES O. DWIGHT, ERWIN H. WRIGHT and ARTHUR J. DONOVAN, all of Chicago, for appellants; WILLIAM J. FLAHERTY, of Chicago, of counsel.

HAROLD L. WARD and KAMIN, GLEASON & KAMIN, all of Chicago, for appellee.

MR. PRESIDING JUSTICE LEWE delivered the opinion of the court.

By this appeal defendants seek to reverse a judgment in the sum of $3,500 entered upon the verdict of a jury for personal injuries sustained by plaintiff. Defendants' motions for judgment notwithstanding the verdict and for a new trial were overruled.

On March 19, 1943 plaintiff boarded defendants' westbound streetcar on 51st street in the City of Chicago. Entrance and exit of the streetcar, which was operated by one man, were at the front end. The front platform, where the passengers enter and leave, is a step below the interior of the streetcar. On the day of the occurrence there was a drizzling rain. The front platform and the floor of the car, both constructed of wood, were wet. After riding a few blocks, one Lottie Cook, a business acquaintance of plaintiff, boarded the car and sat beside her. When the car reached a point about one half block from the place where plaintiff and her friend intended to alight they arose and walked a few steps forward, Mrs. Cook preceding plaintiff. As the streetcar slowed down plaintiff slipped and fell, causing the injuries complained of.

The gist of the complaint is that defendants stopped their streetcar in a sudden and "jerky" manner and permitted the front platform of the car to remain wet and in a slippery condition.

Plaintiff testified that she was 44 years of age and operated a grocery and meat market with her husband at 5225 Prairie avenue, Chicago; that she was standing "one step above the platform where the motorman stands"; that the streetcar was "slowing down like and was coming to a stop and it jerked three or four times and it throwed me off my balance and I slipped down on the platform near the motorman. I sat down with my right leg under me. At the time the floor of the platform was wet."

Mrs. Lottie Cook, called in behalf of plaintiff, testified that the car was moving when she got up from her seat and walked towards the front, and that plaintiff walked back of her; that the car "slowed down and it gave a couple of strong jerks," and "I fell on the door, caught hold of the rail where the door opens"; that when she alighted from the car she turned around to say good-bye to plaintiff and saw her lying on the floor; that as the streetcar was stopping it "made a couple of big jerks"; that the streetcar does not usually stop with big jerks like that; "those jerks I spoke about occurred just before the door opened."

Samuel Genda, a police officer testifying in behalf of defendants, said that he interviewed plaintiff at the hospital on the day of the accident; that plaintiff told him she fell inside the streetcar as she was getting off, causing the injury to her right ankle; and that during this interview she made no reference to the streetcar stopping with a "jerk."

Edward F. Weingardner, an investigator for the Chicago Surface Lines called by defendants, testified that he interviewed plaintiff at her home on May 10, 1943; that plaintiff told him that the streetcar was standing still at the regular stopping place; that she was at the exit section of the front platform; and that she made a step toward the platform edge when her right foot slipped and she fell to the platform.

Allen Polk, an investigator for the Chicago Surface Lines, testified that on April 7, 1943 he interviewed plaintiff's witness Mrs. Cook; that Mrs. Cook stated that she was not sure whether the car was standing or moving at the time of the accident; that she had just alighted when she heard someone in the car scream; that Mrs. Cook did not tell him anything about the streetcar "stopping with two jerks."

William Brooks, a passenger on the streetcar, called by defendant, testified that he was standing on the front platform a little behind the motorman and facing the door looking at people going out and coming in; that he saw plaintiff come from her seat; that the streetcar "stopped normally" and did not make two, three or four jerks as it came to a stop; that the streetcar "was not moving when plaintiff stepped on the bottom of that car and her foot slipped"; and that he assisted the motorman in helping up the plaintiff.

Hattie Brooks, wife of William Brooks, testified that she was standing near her husband on the front platform; that the car "came to a stop just moderately, as it generally does"; that it did not make any jerks; that after the car stopped the doors were opened and people were getting on and off; that she saw plaintiff step out on the platform, that her feet slipped and she sat down; and that at that time the car was standing still.

William Barth, the streetcar operator, testified that on the morning in question "the rail was perfect" and his brakes "were okay"; that he made a smooth stop and did not jerk his car with "a series of three or four jerks" in coming to a stop. "Three or four passengers got off the car, two got on the car, then there was a lady came running out of the inside of the car. She slipped on the floor of the streetcar onto the platform."

■ Defendants contend that no negligence on their part was proved, and maintain in their argument that the most that can reasonably be said for plaintiff's testimony is that it would tend to prove that the alleged jerk was the usual and regular movement made by a streetcar in coming to a stop.

In *Kaldunski v. Chicago City Ry. Co.*, 250 Ill. App. 475, the same arguments were advanced by the defendants as in the case at bar under facts and circumstances not unlike those in the present case. There the court said, at page 478:

"No matter what the rule may be in other jurisdictions, it is fairly well settled in this State that where there is an unusual or extraordinary lurch or jerk of the car upon which a person is riding as a passenger and, by reason thereof, a person is thrown down, that it becomes a question of fact for the jury as to whether or not the accident was caused by the negligent operation of the car or train."

In *Heineke v. Chicago Rys. Co.*, 279 Ill. 210, the court said, at page 213:

"The jerk or sudden stop and lurch of the car is shown by the evidence in the record to have been the controlling and proximate cause of defendant in error's injury. The operation of the car was entirely within the control of plaintiff in error's servants, and a sudden jerk or lurch of the character disclosed by the evidence, being a cause within the control of the carrier, causes to arise a presumption of negligence on the part of the carrier and was sufficient upon which to submit to the jury the question of negligence. *Chicago City Railway Co. v. Morse*, 197 Ill. 327; *West Chicago Street Railroad Co. v. Nash*, 166 id. 528."

Defendants say that the evidence is not sufficient to prove that the condition of the floor or the platform

was other than would ordinarily be found on a rainy drizzly day when people are continually entering the car with wet shoes; and that plaintiff knew it was wet and she made no attempt to guard against whatever danger that condition presented.

As pointed out in *Kaldunski v. Chicago City Ry. Co.,* 250 Ill. App. 475, 480, if the accident had resulted solely from the slippery condition of the wooden platform defendants' position would not be without merit, but the slippery condition of the wooden platform coupled with the sudden jerk of the streetcar was sufficient to submit the matter to the jury.

Determination of the probative value of the evidence and the conclusions to be drawn from it lies within the province of the jury. This court will not substitute its judgment for the verdict of the jury unless the evidence is clearly insufficient to support the verdict. (*Jones v. Esenberg,* 299 Ill. App. 551, 20 N. E. (2d) 906; *Mueth v. Jaska,* 302 Ill. App. 289, 23 N. E. (2d) 805; *Philpott v. Parham,* 316 Ill. App. 278, 44 N. E. (2d) 934.) We think the evidence was ample to support the jury's verdict.

Defendant next contends that the damages awarded are excessive. The evidence shows that the tibia and fibula at the right foot were fractured in that region and just above the ankle, causing extreme swelling and deformity of the right leg. A plaster cast was applied from the toes to mid-thigh. After five or six weeks the cast was removed at the hospital. During this period and for some time thereafter plaintiff used crutches in walking. An examination in January 1945 by plaintiff's physician, Dr. Compere, disclosed moderate swelling around the right ankle, causing it to be about 15 per cent larger than the left ankle. At that time the normal motion of the injured ankle was about 80 per cent. At the trial plaintiff testified that the leg still swells and frequently pains. After the accident plaintiff was unable to perform

any service in her business and never returned. Because of her absence two part-time employees were engaged at the store. Subsequently the business was disposed of. Plaintiff's doctor's bills amounted to $250 and the hospital bill $84.95.

█ The question of damages is peculiarly one of fact for the jury. (*Ford v. Friel,* 330 Ill. App. 136.)

█ In our opinion the award was justified by the evidence, and we are not disposed to disturb it.

█ Defendants urge that certain X-rays (Plf's Exh's 2–A, 2–B, 3–A, 3–B, 4–A and 4–B) were not admissible. Dr. Compere, plaintiff's physician, testified that these exhibits were films taken under his supervision and control at the Chicago Memorial Hospital; that he is familiar with the type of X-ray machine he used; that it was in good working order; that the body of the patient was properly exposed to the X-ray tube; and that the films were properly developed "so far as I know"; "sometimes I stand by to see the films as soon as they are developed; I don't recollect whether or not I did that in this case." Defendants argue that the technician who took the X-rays was not produced as a witness and that they therefore were inadmissible. X-rays numbered Plaintiff's Exhibits 6 and 7 were taken at Dr. Compere's office. These were afterwards introduced in evidence. He testified that from his examination of the films taken in his office (Plf's Exh's 6 and 7) and Plaintiff's Exhibits 2–A, 2–B, 3–A, 3–B, 4–A and 4–B he was "certain" that the exhibits objected to, taken at the hospital, showed the same injury to the same person (plaintiff) as those taken at his office. Moreover, Defendants' Exhibit 5, entitled "Chicago Memorial Hospital History Sheet" contains the Roentgen report describing the pathology shown in the X-ray films taken at the hospital. There can be no doubt that the films objected to were those taken of the plaintiff at the hospital and therefore admissible and properly read to the jury.

■ Defendants maintain that plaintiff's counsel indulged in prejudicial argument. The record discloses that plaintiff's son Arthur Lazarus appeared as a witness while dressed in an Army uniform, wearing service ribbons, among them being the Purple Heart. In his opening argument plaintiff's counsel addressing the jury said that "fate decreed that he (Arthur Lazarus) had a furlough in Chicago just at the period that this case was called." Defendants also complain of the following language used by counsel for plaintiff in the closing argument: "As to the son, it was a lucky result that brought him home so that he could be at his mother's side; and, by the way, the name is Lazarus, and everyone has a right to have their name pronounced properly. I think there is an element of ridicule there. They called it Lazarus all the way through, just as the son, fresh from the battlefields of Europe." Defendants say there was no reason for telling the jury that plaintiff's son was fresh from the battlefields of Europe or to remind it of the service ribbons and the Purple Heart. It appears that defendants' counsel in his argument stated: "Why do you think the son was brought here? Well, perhaps it was for the effect of having the uniform of the United States Army to impress you. If that had been the purpose, it is the worst purpose that the uniform was ever put to."

The evidence shows that plaintiff came here from Rumania when she was fourteen years of age and did not attend school in this country. Her son, Lazarus, worked in the store and assisted his father in keeping the books. His testimony was competent and material. He was still in the Armed Forces and had a right to wear the uniform. Moreover, defendants' counsel's reference to the witness's ulterior purpose in wearing his uniform in court was likely to provoke the remarks complained of. Although that portion of plaintiff's counsel's argument hereinabove referred

to is subject to criticism we do not think that it is of such a character as to warrant a reversal of the judgment.

Finally defendants complain of the court's refusal to give one instruction offered in behalf of defendants and of two instructions given in behalf of plaintiff. The record shows that the issues of fact submitted were relatively simple. In all, the court gave 31 instructions, 9 for plaintiff and 21 for defendants. We have examined all the instructions in behalf of plaintiff and those given in behalf of defendants as well as defendants' refused instruction. The given instructions accurately and fully stated the law governing the case.

For the reasons stated, the judgment is affirmed.

*Affirmed.*

KILEY and BURKE, JJ., concur.